IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

RICHARD J. REEDAL,                          )
                                            )
            Plaintiff,                      )      TC-MD 140299N
                                            )
      v.                                    )
                                            )
DEPARTMENT OF REVENUE,                      )
State of Oregon,                            )
                                            )
            Defendant.                      )      **FINAL DECISION**

The court entered its Decision in the above-entitled matter on January 23, 2015. Plaintiff timely filed a Statement for Costs and Disbursements on February 5, 2015. Defendant timely filed an Objection on February 17, 2015. Plaintiff did not request leave to file a response to Defendant's objection and neither party requested a hearing. The matter is now ready for the court's Final Decision. The court's Final Decision incorporates its Decision without change and includes its analysis and determination of Plaintiff's Statement for Costs and Disbursements in section III.

Plaintiff appeals Defendant's Notice of Deficiency for the 2009 tax year. A trial was held in the Oregon Tax Courtroom on November 25, 2014, in Salem, Oregon. Bernard Chamberlain, attorney at law, appeared on behalf of Plaintiff. Plaintiff and Miles "Spike" Joseph (Joseph), CPA, testified on behalf of Plaintiff. Cynthia J. Toman, Tax Auditor, appeared on behalf of Defendant. Defendant did not call any witnesses. Plaintiff's Exhibits 1 through 35 were received without objection. Defendant's Exhibits A through T, V, W, BB, CC, EE, FF, and KK

/ / /

/ / /

/ / /

FINAL DECISION  TC-MD 140299N                                                    1

through NN were received without objection.  Plaintiff objected to Defendant's Exhibits U, X, Y, Z, AA, DD, and GG through JJ and the court excluded those exhibits.[1]

## I.  STATEMENT OF FACTS

On his 2009 Schedule E, Plaintiff reported a total partnership loss of $137,426.  (Ptf's Reply at Ex B.)  The total loss included $26,112 from "Blue Spruce Lodge, LLC" (Blue Spruce); $9,026 from "Section 743(B) Depreciation Adjustment"; and $102,288 from "Debt-Financed Acquisition Interest."  (*Id.*)  In the Notice of Deficiency dated February 4, 2014, Defendant wrote,

> "Blue Spruce Lodge LLC's partnership return for 2009 was received in Oregon on December 21, 2012.  The statute of limitations ends on December 22, 2015, three years from the date of filing.  As a result, your individual return remains open for any notice of deficiency for items related to Blue Spruce Lodge LLC until December 21, 2015."

(Ptf's Ex 12 at 3.)  Defendant disallowed the "Blue Spruce Lodge LLC loss" because the auditor determined "the LLC was not carrying on a business activity."  (*Id.*)  Defendant also imposed a 20 percent substantial understatement of income penalty.  (*Id.*)

Plaintiff testified that Blue Spruce was a partnership formed in 1995 between Larry Barnes (Larry) and his wife Linda; Plaintiff's brother Scott Reedal (Scott) and his wife Linda; and Plaintiff and his former wife Deborah Reedal.  (*See* Ptf's Ex 17.[2])  He testified that the partnership had an operating agreement and articles of organization filed in Montana.  (*See* Ptf's Exs 17, 18.)  Plaintiff testified that Blue Spruce purchased a lodge property (the lodge) in Montana that originally included a nine-bedroom facility with a living area, kitchen, caretaker's

/ / /

---

[1] The exhibits were letters and emails that Plaintiff asserted included hearsay and settlement discussions. Defendant did not offer any testimony regarding the exhibits or explain the relevance of the exhibits in this *de novo* proceeding.  As a result, the court excluded the exhibits.

[2] The Articles of Organization list Clara Barnes as a partner, not Linda Barnes.  (Ptf's Ex 17 at 2.)

house, hot tub, barn, and four-car garage. He testified that the lodge burned down in 1999 and was replaced with two three-bedroom log homes, one of which has a basement studio.

Plaintiff testified regarding Blue Spruce's operations from 1995 to approximately 2007. He testified that Blue Spruce operated the lodge as a "guest lodge" that offered its guests a continental breakfast and dinner. Plaintiff testified that Linda Barnes would do the housekeeping and Linda Reedal would do the baking and cooking. He testified that lodge guests could go hiking, fishing, or sightseeing. Plaintiff testified that Blue Spruce did not have an outfitters license to take guests hunting, but they could give guests suggestions on good hunting locations. He testified that the lodge had a pontoon boat for fishing. At trial, Defendant stipulated that Blue Spruce was carrying on a trade or business up until the middle of 2007.

A.      *Removal of Scott as Manager of Blue Spruce*

Plaintiff testified that Larry and Scott had a falling out after the original lodge burned down. He testified that Larry moved off the lodge property, but Scott remained. Plaintiff testified that, in 2005, Scott wanted to keep running the lodge and buy out Larry's interest; however, Plaintiff and Larry did not want to continue working with Scott and they wanted to sell Blue Spruce. Plaintiff testified that, around that time, the partners called a meeting and voted to remove Scott as manager. Plaintiff testified that, as a result, Scott became violent towards Plaintiff. He testified that Scott thought he was the "manager for life." Plaintiff testified that, in 2006, he and Larry filed suit to remove Scott as manager and replace him with Plaintiff. (*See* Ptf's Ex 20 (Arbitrator's Decision and Order, dated September 20, 2007).) The matter was referred to an arbitrator pursuant to Blue Spruce's Operating Agreement. (*See* Ptf's Ex 18 at 22, Ex 20 at 1.) Plaintiff testified that the arbitrator removed Scott as lodge manager. (*See* Ptf's Ex

/ / /

20 at 2 (stating that, in the arbitrator's Opinion letter issued September 9, 2006, "Scott was removed as manager and as a voting member of the LLC, but was not dissociated as such").)

Plaintiff testified that, despite the arbitrator's order, Plaintiff never received many of Blue Spruce's documents from Scott, including the guestbook, the original operating agreement, the receipt book,[3] mail, and bank records. He testified that he had to open a new bank account and post office box for Blue Spruce.

B.      *Plaintiff's Acquisition of Scott's Interest in Blue Spruce After 2007*

The Arbitrator's Decision and Order, dated September 20, 2007, stated that

> "The issue of Scott Reedal's 1/3 interest in the real estate owned by the LLC has been resolved by an agreement entered into by all of the parties in June, 2007. In that agreement Scott Reedal and Linda Reedal will sell their interest in the real estate to Richard J. Reedal. Also, as a part of said agreement, Scott and Linda agree to voluntarily dissociate from member status in the LLC. The parties also agree that that the fair market value of Scott and Linda's interest is $638,000.00."

(Ptf's Ex 20 at 2.) Plaintiff testified that he agreed to buy Scott's interest because Larry did not have sufficient funds. Plaintiff testified that a note was executed and he then became a two thirds owner of Blue Spruce. (*See* Ptf's Ex 22 at 1.[4]) The Promissory Note dated September 21, 2007, and signed December 8, 2008, stated that Plaintiff would pay Scott $670,099.87 plus interest at the rate of 7.75 percent per annum. (*Id.*)

Plaintiff provided a copy of a Settlement Agreement (Agreement) entered by the Montana State Supreme Court on February 17, 2009. (Ptf's Ex 19.) The Agreement stated that Plaintiff, Scott, and Linda participated in Appellate Mediation concerning matters related to Blue Spruce. (*See id.*) The Agreement stated that, in part, that "Scott and Linda agree that the Promissory Note dated September 21, 2007 and signed by Clerk of the District Court Diane F.

---

[3] Plaintiff testified that the packet of receipts provided with Defendant's Exhibits was not complete because Scott kept a lot of the records and would not provide them to Plaintiff. (*See* Def's Ex F.)

[4] Plaintiff submitted two exhibits labeled as Exhibit 22, page 1.

Rummel on December 8, 2008 is current, not in arrears and shall remain in full force and effect. The next payment on the Promissory Note is due on or before October 21, 2009." (*Id.* at 2.) Plaintiff provided a 2009 Form 1098 Mortgage Interest Statement from Lake County Land Company, DBA Thompson Falls Escrow, reporting that Plaintiff paid interest of $102,288.32 in 2009. (Ptf's Ex 23 at 1.) He provided an Account History Ledger reporting that the interest was paid to Scott and Linda. (*Id.* at 3.)

C.      *Plaintiff's Management of Blue Spruce Beginning in 2007*

Plaintiff testified that, after Scott was removed as manager, Plaintiff tried to manage the lodge and make repairs, but Scott would interfere and would not allow people onto the lodge property. Plaintiff testified that he had to get an "injunction" against Scott to prevent him from entering the lodge property. (*See* Ptf's Ex 30 at 3-5.) Plaintiff's Petition for Temporary Order of Protection, filed May 4, 2007, stated in part, "Scott has assaulted me twice on business property and an injunction was filed in Circuit Court ordering him not to enter business property without the authorization of the manager." (Ptf's Ex 31 at 4.) In the petition, Plaintiff described a confrontation with Scott on "the business property" on May 3, 2007, in which Scott trespassed on the property and threatened Plaintiff with a rifle. (*Id.*) A temporary Order of Protection was issued May 4, 2007, that restrained Scott from "committing further acts of abuse or threats of abuse" against Plaintiff and ordered him to stay at least 500 feet away from Plaintiff's person, home, workplace, and vehicle. (Ptf's Ex 30 at 3.) Plaintiff testified that Scott disregarded the injunction and continued to enter the lodge property. He testified that, following another confrontation and assault, he obtained a restraining order against Scott. (*See* Ptf's Ex 29.) A permanent Order of Protection was issued July 11, 2007, reciting the same restrictions as the May 4, 2007, temporary order. (*Id.* at 1.) Additionally, the permanent order stated that Scott "is

to stay off of the Blue Spruce Lodge property unless he has requested in writing and received permission to enter said property." (*Id.* at 2.) Plaintiff testified that Scott continued to interfere with the lodge operation in 2008 and 2009.

Plaintiff testified that Blue Spruce reported no gross receipts in 2008 and 2009. (Ptf's Exs 4 at 4, 5 at 4.) He testified that the lodge was not available for rent in 2008 and 2009 because of damage that required repair. On its partnership returns, Blue Spruce reported a repair and maintenance expense of $23,190 in 2007; $6,873 in 2008; and $2,100 in 2009. (Ptf's Exs 6 at 4, 5 at 4, 4 at 4.) Plaintiff testified that, in 2007, his repairs to the lodge included the siding, the roof, the gravel road, and the gas leak. Plaintiff testified that his activities for Blue Spruce in 2009 included repairing the road after the winter; removing invasive weeds; mowing; dealing with Scott and Linda; and trying to recover stolen property on behalf of Blue Spruce. (*See* Ptf's Ex 25 at 1 (list that Plaintiff recreated from his records).) Plaintiff testified that he spent a total of 530.5 hours working for Blue Spruce in 2009. (*See id.*; *see also* Ptf's Ex 35 (Plaintiff's reimbursed expenses and Blue Spruce's 2009 expense detail).)

D.     *Efforts to Sell Blue Spruce*

Plaintiff testified that he thought he would be able to sell Blue Spruce within a year of acquiring Scott's interest and pay off the note to Scott, but then the market crashed. Plaintiff testified that he and Larry listed Blue Spruce for $2,650,000 in August 2008.[5] (*See* Ptf's Ex 32 (listing agreement with Hurd-Bush Realtors).) The Blue Spruce listing was extended in 2010. (*See* Ptf's Ex 33 at 1-2.) Plaintiff testified that Larry wanted to list Blue Spruce for $3 million. Plaintiff testified that Blue Spruce received an appraisal concluding the lodge property's value

---

[5] The listing agreement included the real property as well as the following fixtures and personal property: a boat, snowmobiles, a "tractor w/3-pt. mower and plow", 4-wheelers, furniture, wildlife mounts, a snow blower, and saddles and tack. (Ptf's Ex 32 at 1.)

was approximately $1.9 million as of February 2007. (*See* Ptf's Ex 26 at 5, 32 (appraisals).) Plaintiff testified that he and Larry listed Blue Spruce for more than $1.9 million to reflect the repairs made in 2007 and 2008; to include the business value; and to leave room for negotiating.

E.      *Preparation of Plaintiff's and Blue Spruce's Tax Returns*

Joseph testified that Plaintiff has been his client for over a decade and he started preparing returns for Blue Spruce in about 2006 after the partners' falling out. Joseph testified that the prior accountant for Blue Spruce was incarcerated, so he was unable to obtain his files. Joseph testified that he prepared the 2009 returns for both Plaintiff and Blue Spruce. Joseph testified that, on Plaintiff's 2009 individual return, Plaintiff reported interest paid on the note to Scott Reedal. Joseph testified that the only document that was issued for Plaintiff's payment of interest on the note was the Form 1098 mortgage interest statement. Joseph testified that interest paid on the note was not a partnership expense or item and does not relate to Blue Spruce.

## II. ANALYSIS

The issues before the court are (1) whether Defendant's Notice of Deficiency was time-barred under ORS 314.410 with respect to Defendant's adjustment of Plaintiff's claimed debt-financed acquisition interest of $102,288; (2) whether Blue Spruce was engaged in a trade or business as of the 2009 tax year; and (3) whether the substantial understatement of income penalty was correctly imposed under ORS 314.402.[6]

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue.*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed

---

[6] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2007.

to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). In an income tax appeal, this court has statutory authority "to determine the correct amount of [the] deficiency, even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue[.]" ORS 305.575.

A.      *Statute of Limitations Under ORS 314.410*

ORS 314.410(1) states, "[a]t any time within three years after the return was filed, the Department of Revenue may give notice of deficiency as prescribed in ORS 305.265." ORS 314.410(10) provides an exception to the time limit in ORS 314.410(1), stating in part,

> "(a) Notwithstanding the other provisions of this section and ORS 314.415, the period for * * * giving a notice of deficiency with respect to an item that is shown or required to be shown on a taxpayer's return and that is attributable to a pass-

> through entity does not expire prior to three year's from the date of filing of the pass-through entity return to which the item on the taxpayer's return relates."

Defendant issued its Notice of Deficiency for the 2009 tax year on February 4, 2014, relying on the exception in ORS 314.410(10) because Blue Spruce did not file its partnership return until December 21, 2012. (*See* Def's Reply Br at 3-4.) Plaintiff contends that his debt-financed acquisition interest is not attributable to Blue Spruce and, as a result, Defendant's adjustment of that item is time-barred under ORS 314.410(1). (*See* Ptf's Reply at 2.)

In an Order issued September 23, 2014, the court reviewed the text, context, and legislative history of ORS 314.410(10) in order to discern the legislature's intent. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993); *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). In its prior Order, the court concluded that Defendant's Notice of Deficiency is timely under ORS 314.410(10) only "if the item on Plaintiff's return is caused by, or occurring on account of, Blue Spruce." The court was unable to make a determination in

/ / /

its prior Order because Plaintiff did not provide sufficient evidence. At trial, Plaintiff provided additional evidence including exhibits and the sworn testimony of himself and his CPA, Joseph.

Based on the testimony and evidence presented, the court concludes that interest paid by Plaintiff to Scott was not attributable to Blue Spruce within the meaning of ORS 314.410(10) and did not relate to Blue Spruce's 2009 partnership return. As explained in the arbitrator's opinion letter, Scott was not dissociated from Blue Spruce by order of the arbitrator and Blue Spruce did not purchase Scott's interest. Rather, Plaintiff and Scott reached an agreement and executed a promissory note, whereby Plaintiff agreed to purchase Scott's interest in Blue Spruce and make payments over a period of ten years. Joseph testified that the interest that Plaintiff paid to Scott on the promissory note was not a partnership item that was or should have been reported on Blue Spruce's 2009 partnership return. Joseph's testimony is supported by the copy of Blue Spruce's 2009 partnership return provided by Plaintiff. Joseph testified that substantiation for the interest payment is provided by the Form 1098 mortgage interest statement, which was provided by Plaintiff. As a result, the court concludes that Defendant's adjustment of Plaintiff's claimed debt-financed acquisition interest of $102,288 was time-barred under ORS 314.410.

B.      *Whether Blue Spruce was Engaged in a Trade or Business in 2009*

"The Oregon Legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code (IRC) for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law." *Ellison v. Dept. of Rev.*, TC-MD 041142D, WL 2414746 at *6 (Sept 23, 2005) (citing ORS 316.007). As a result, the legislature adopted, by reference, the federal definition for deductions, including those allowed under section 162 of the Internal Revenue Code for trade or business expenses and IRC section 212 expenses incurred for the production of income. The code and regulations preclude

deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in section 183. Treas Reg § 1.183-2(a). Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992) (citations omitted).

IRC section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]"[7] In *Comm'r v. Groetzinger*, the United States Supreme Court held that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987). The Court further stated "that resolution of this issue 'requires an examination of the facts in each case.' " *Id.* at 36, citing *Higgins v. Comm'r*, 312 US 212, 217, 61 S Ct 475, 85 L Ed 783 (1941).

Here, Defendant stipulated that Blue Spruce was carrying on a trade or business until mid-2007. Defendant argues that the business activity ceased after that time, as evidenced by the lack of receipts in 2008 and 2009. Thus, the question becomes whether Blue Spruce had abandoned its business activity as of 2009.

1.      *Temporary Cessation vs. Abandonment of Business Activity*

In *Morley v. Comm'r*, the United States Tax Court found that the taxpayer had not "abandoned his business of selling real estate" even though his "purchases and sales of property virtually ceased" after 1931. 8 TC 904, 915-16 (1947). The court was persuaded that the

---

[7] In its Auditor's Report, dated January 28, 2014, Defendant applied the definition of "trade or business activity" found in Treas. Reg. 1.469-4, which specifically refers to IRC section 162. (Ptf's Ex 13 at 3.)

taxpayer's "activity was not restricted or halted by reason of any change in his plans or purpose, but rather by the force of economic circumstances beyond his control and not of his making." *Id.* at 916. The court noted that, "[a]lthough certainly not determinative," the facts that taxpayer maintained his real estate broker's license and resumed his activities "shortly prior to the hearing of this case" both indicated that he "did not abandon his business of selling real estate[.]" *Id.*

Similarly, in *Haft v. Comm'r*, the court allowed the taxpayer's business expense deductions for the 1958 tax year even though he had terminated his employment as a salesman and sales manager in September 1957. 40 TC 2, 3, 6 (1963). The court found the taxpayer had been in the "costume jewelry business" from 1932 through 1957 and he "still regarded himself as being in the costume jewelry business and actively sought other business connections" in 1958. *Id.* at 5-6. Specifically, the court noted that the taxpayer kept in contact with his customers and continued to entertain buyers and other store representatives to maintain goodwill. *Id*. at 6. The court explained that taxpayer "did not cease to be in the costume jewelry business in 1957 and 1958 merely because he temporarily had no merchandise to sell. It was a period of transition in which he was actively seeking another connection that would enable him to continue to serve the same customers with whom he had previously dealt." *Id.*

2.      *Expenses Associated with Winding Up the Business*

Under Rev. Rule. 67-12, "the ordinary and necessary expenses, incurred in a trade or business in prior years and paid in the current taxable year, by an individual taxpayer, using the cash receipts and disbursements method of accounting, are deductible under section 162 of the [IRC], even though the business has been discontinued." Rev. Rul. 67-12, 1967-1 CB 29. In the context of a determining whether a taxpayer was entitled to deduct a net operating loss sustained on the sale of real property, the Second Circuit held

> "that it was not necessary for [taxpayer] to prove that he was actively engaged in such business in the year 1945 when the property in question was sold. If property is acquired in the operation of the business, the sale of it is part of such operation, although it be the last transaction and made for the very purpose of closing out the business."

*Guggenheimer v. Comm'r*, 209 F2d 362, 364 (2nd Cir 1954). In the context of determining whether the code limited a net operating loss carryover, the Sixth Circuit considered the question "what degree of activity is necessary to sustain the characterization 'active trade or business.' " *Six Seam Co., Inc. v. U.S.*, 524 F2d 347, 353 (6th Cir 1975). The court observed "that even a corporation in the process of formal liquidation will to some degree be engaged in business since the cessation of business activities necessarily involves a period of time." *Id.*

3.      *Whether Blue Spruce Had Abandoned its Business as of 2009*

The facts presented in this case could support a finding that Blue Spruce had temporarily ceased renting out the lodge as of 2009 due to circumstances beyond its control or that Blue Spruce was winding up its business activity. Plaintiff testified that, after becoming manager of Blue Spruce in 2007, he made necessary repairs to the lodge in 2007 and 2008. His testimony is supported by the repair and maintenance expenses reported on Blue Spruce's partnership returns for those years. Plaintiff testified that his efforts to make repairs and rent the lodge from 2007 through 2009 were hindered by Scott's continued interference with the business. Plaintiff provided evidence that Scott refused to turn over Blue Spruce property and records to Plaintiff, that he trespassed on the lodge property, and that he threatened Plaintiff on multiple occasions. Plaintiff testified, and the evidence supports, that Plaintiff expended time and resources during those years trying to recover business property from Scott and obtaining court orders to prevent Scott from entering the lodge property. Those facts all tend to support a finding that, as of 2009, Blue Spruce was unable to rent out the lodge property due to circumstances beyond its control.

Some testimony and evidence presented supports a finding that Blue Spruce was winding up its business activity in 2008 and 2009. Specifically, Plaintiff testified that, as early as 2005, Plaintiff and Larry wanted to sell Blue Spruce. After Scott left the partnership in 2007, the remaining partners acquired an appraisal of the lodge in 2007 and listed Blue Spruce for sale beginning in 2008. Plaintiff testified that they were unable to sell Blue Spruce due to the unanticipated economic downturn. Under either view of the facts, the court concludes Blue Spruce had not abandoned its business activity as of 2009 and Plaintiff is allowed to deduct his distributive share of Blue Spruce's ordinary business loss for the 2009 tax year.[8]

C.    *Substantial Understatement of Income Penalty*

Plaintiff challenged the 20 percent substantial understatement of income penalty imposed by Defendant. Under ORS 314.402, when reported income is understated in excess of $15,000 in a taxable year, "there shall be added to the amount of tax required to be shown on the return a penalty equal to 20 percent of the amount of any underpayment of tax attributable to the understatement of taxable income." Here, Defendant imposed the substantial understatement of income penalty based on its adjustments to Plaintiff's 2009 income tax return. Plaintiff challenged those adjustments and the court concluded that Plaintiff's appeal should be granted. As a result, the court concludes that the 20 percent substantial understatement of income penalty is not applicable in this case and should be cancelled.

## III.  COSTS AND DISBURSEMENTS FACTS AND ANALYSIS

The Magistrate Division has discretionary authority under ORS 305.490(2) to award costs and disbursements to the prevailing party. *Wihtol I v. Dept. of Rev.*, 21 OTR 260, 267 (2013). The Magistrate Division promulgated a rule, Tax Court Rule-Magistrate Division

---

[8] There is no contention in this case that Plaintiff failed to provide adequate substantiation.

(TCR-MD) 16, setting forth the procedure for a prevailing party to request costs and disbursements. As required under TCR-MD 16 C(1), Plaintiff filed a signed and detailed Statement for Costs and Disbursements (Statement) on February 5, 2014, requesting that the court award him costs and disbursements totaling $756.44. Plaintiff attached Exhibit 1 itemizing his requested costs and substantiating those costs with receipts and invoices. Defendant filed an objection on February 17, 2015.

Under TCR-MD 16 B, "costs and disbursements may be allowed to the prevailing party[.]" *See Wihtol v. Multnomah County Assessor* (*Wihtol*), TC-MD No 120762N, WL 274126 at *2 (Jan 24, 2014). There is no question that Plaintiff is the prevailing party in this matter. Plaintiff was granted his requested relief. The question is whether the court should, in its discretion, award Plaintiff his costs and disbursements. *See id.* at *4 ("[t]he award of costs and disbursements is entirely discretionary with the court" (citations omitted)).

A.      *Whether Plaintiff Should be Awarded Costs and Disbursements*

Citing *Wihtol*, Defendant objects to an award of costs and disbursements in this case because, following issuance of Defendant's Notice of Deficiency, "Plaintiff did not file either a written objection or conference [request] and chose to file a complaint in the Magistrate Division." (Def's Objection at 1.) Defendant further notes that "[t]he 2009 partnership return filed for Blue Spruce Lodge, LLC was untimely and only filed at the request of [D]efendant." (*Id.* at 2.) Finally, Defendant asserts that "Plaintiff provided additional exhibits at trial that were not provided during the audit. Consequently, Defendant was unable to take into consideration those documents in the audit findings * * *." (*Id.*)

In *Withol*, the court described several considerations that may be relevant to the court's exercise of its discretion whether to award costs and disbursements. 2014 WL 274126 at *5.

The court observed that, "where taxpayers fail to timely and properly file returns or fail to take advantage of available administrative review, this court may decline to award costs even if taxpayers ultimately prevail in their appeal." *Id.* Defendant noted that Blue Spruce Lodge, LLC failed to timely file its 2009 partnership return. However, there is no allegation that Plaintiff failed to timely file his 2009 Oregon income tax return. As Defendant noted, Plaintiff did not request a conference prior to filing this appeal. However, the exhibits submitted demonstrate that Plaintiff actively participated in Defendant's audit. (*See* Ptf's Exs 14-17 (auditor reports); Def's Exs T, V, W (letters from Defendant requesting documents and referencing prior conversations with Plaintiff's representative).) As in *Withol*, the court is persuaded that Plaintiff "took adequate steps to avoid the necessity of litigation in the case" and is entitled to recover his costs and disbursements. 2014 WL 274126 at *6.

B.      *What Amount of Costs and Disbursements Should be Allowed*

TCR-MD 16 A states, in pertinent part,

" 'Costs and disbursements' are reasonable and necessary expenses incurred in the prosecution or defense of an action other than for legal services, and include the filing fee; the fees of officers; the statutory fees for witnesses; the postage for summonses or notices; the necessary expense of copying of any public record, book, or document used as evidence in the trial; recordation of any document where recordation is required to give notice of the creation, modification, or termination of an interest in real property; a reasonable sum paid a person for executing any bond, undertaking, stipulation, or other obligation therein; and any other expense specifically allowed by agreement, by these rules, or by other rule or statute."

Plaintiff requested costs for the court filing fee, postage, copying costs, "CPA fees for providing documents relating to Montana litigation," and courier fees to deliver exhibits. (*See* Ptf's Statement at Ex 1.) Defendant objects to two expenses on Plaintiff's Statement: an expense of $96.26 paid to Office Depot on November 14, 2014, and an expense of $262.50 for "CPA fees." (Def's Objection at 2; Ptf's Statement at Ex 1.)

Defendant objected to Plaintiff's payment of $96.26 to Office Depot for copying because Plaintiff did not provide a receipt, but rather provided "a debit charge on [Plaintiff's counsel's] account[.]" (Def's Objection at 2.) The bank statement provided by Plaintiff establishes the amount paid to Office Depot. Thus, the only question is whether the payment was for "copying," as reported on Plaintiff's Statement. Plaintiff's Statement was signed by his attorney and includes a declaration that it "is true to the best of [his] knowledge and belief, * * * and is subject to penalty for perjury." (Ptf's Statement at 1.) The court is persuaded that the $96.26 payment to Office Depot was for copying, as reported by Plaintiff's attorney. Thus, the expense is allowed under TCR-MD 16 A.

Defendant objected to the $262.50 payment to Plaintiff's CPA because, "accounting expenses are accounting fees and not costs and disbursements." (Def's Objection at 2, citing *Biss v. Department of Revenue* (*Biss*), TC-MD 130485C, WL 1976760 at *6 (May 15, 2014).) Plaintiff provided an invoice from his CPA, Joseph, for $682.50. (Ptf's Cost Statement at 6.) Plaintiff seeks to recover as a cost the time billed for Joseph to "scan documents for attorney for Oregon Tax Court trial," "review document request [from] attorney via email," and "email tax returns to attorney," a total of 1.5 hours billed at $175 per hour. (*Id.*)

As this court explained in *Biss*, "accountant fees are 'expenses,' not 'costs and disbursements.'" 2014 WL 1976760 at *6. Pursuant to ORS 305.490(3)(a)(B), accountant fees may be awarded as "reasonable expenses" in certain proceedings "before the tax court judge[,]" but they may not be awarded by tax court magistrates. *Id.* The invoice provided by Plaintiff is for CPA fees. Even though Plaintiff's CPA billed Plaintiff for time spent reviewing, scanning, and emailing documents, those expenses are "accountant fees" not copying costs. The court concludes that Plaintiff's CPA fees of $262.50 are not recoverable costs.

Plaintiff's request for costs and disbursements is granted in part. Plaintiff has provided adequate documentation to support a cost award of $493.94.

## IV. CONCLUSION

After careful consideration, the court concludes that Defendant's adjustment of Plaintiff's debt-financed acquisition interest of $102,288 is time-barred under ORS 314.410. The court further concludes that Blue Spruce was engaged in an active trade or business in 2009 and Plaintiff's distributive share of Blue Spruce's ordinary business loss for the 2009 tax year is allowed. The court further concludes that the 20 percent substantial understatement of income penalty should be cancelled. The court further concludes that Plaintiff's request for costs and disbursements under TCR-MD 16 is granted in part. Plaintiff is awarded costs of $493.94. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.

IT IS FURTHER DECIDED that Plaintiff's request for costs and disbursements under TCR-MD 16 is granted in part. Plaintiff is awarded costs of $493.94.

Dated this ____ day of March 2015.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer on March 6, 2015. The court filed and entered this document on March 6, 2015.*